| | |
|---|---|
| CYNTHIA PUA MATAGOLAI, individually and as guardian ad Litem for Jasper P. Matagolai,<br><br>          Plaintiff,<br><br>     vs.<br><br>CARIDAD M. PANGELINAN, ASSOCIATED INSURANCE UNDER-WRITER OF THE PACIFIC, INC., a corporation, LINCOLN LIFE INSURANCE COMPANY, a corporation, RUFINA Q. MATAGOLAI and TANA Q. MATAGOLAI, DOES I THROUGH X,<br><br>          Defendants. | ) Civil Action No. 85-409<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) MEMORANDUM OPINION<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

FACTS

Jesus P. Matagolai was a Commonwealth Government employee since 1971. Prior to 1983 he was married and had two children, Ruth and Tana (Tanya) Matagolai. After a divorce from his first wife, he married the plaintiff, Cynthia Pua Matagolai in 1983. Jesus and Cynthia had gone together five years before their

**For Publication**

1122

marriage.  This union produced Jasper P. Matagolai, their son.[1]

After the marriage, in 1983 and 1984, Jesus applied for and was issued two life insurance policies on his life.  One was with the Pacific Guardian Life Insurance Co., Ltd. (Pacific) for $25,000.  The beneficiaries were Cynthia and Jasper in equal shares.  The second policy was with the Lincoln National Life Insurance Company (Lincoln) for $50,000.  The beneficiaries were Cynthia and Jasper in equal shares.

As a government employee, Jesus joined the government retirement fund and made contributions to the fund.  The benefits to be derived from the fund upon death of a member include a $1,000 lump sum death benefit, up to 50% salary benefits to surviving spouse and $90 per month per child until the child marries or attains 18 years or, if attending school, attains 22 years of age.

In February of 1985, Jesus became ill and was admitted to Dr. Torres Hospital on Saipan and then was transferred to the Guam Memorial Hospital.  From there, he was transferred to Tripler Army Medical Center in Honolulu in March of 1985.  Cynthia and the sister of Jesus, defendant Caridad M. Pangelinan, accompanied Jesus to Honolulu.

---

[1]The couple had another child who predeceased the death of Jesus.

On March 21, 1985 Jesus executed a change of beneficiary form provided by Lincoln and as a result the beneficiaries were changed to:

> 20% Jasper Matagolai, son
> 20% Ruth Matagolai, daughter
> 20% Tana Matagolai, daughter
> 40% Rufina Matagolai, mother of Jesus[2]

Caridad left Honolulu for Saipan on or about April 2nd, 1985 and thereafter Cynthia was the only family member with Jesus.

On April 17th Cynthia signed a special power of attorney making Caridad her attorney to do certain things (see Plaintiff's Exhibit 6). On the same date, Jesus signed a general power of attorney which named Caridad as his attorney (see Plaintiff's Exhibit 5).

On May 21, 1985, Caridad executed a resignation form (Plaintiff's Exhibit 11) which terminated the status of Jesus as an employee of the government. This was a prerequisite to the withdrawal of Jesus from the retirement fund. This was accomplished a day later when Caridad applied for a refund of the accumulated

---

[2]The exhibit reflecting this change is Plaintiff's Exhibit 7. Due to the poor reproduction, the court has inked in the percentages indicated. This was with the approval and consent of all parties. However, the parties reserved the right to argue the implications and effect, if any, of the change of beneficiaries.

One argument (not seriously advanced) is that the form provides for "primary" and "contingent" beneficiaries and certain names are opposite these designations. In view of the fact that the percentages assigned to individuals named total 100%, the court finds no significance to the "primary" or "contingent" printed words.

contributions of Jesus (Plaintiff's Exhibit 13). As a result, a check for $2,914.74 was issued to Jesus P. Matagolai on June 7, 1985 (Plaintiff's Exhibit 16). This amount was placed in the bank account of Caridad.

On May 22, 1985, Caridad executed a change of beneficiary form for the Pacific insurance policy. The change as reflected on Plaintiff's Exhibit 8 is as follows:

| | | |
|---|---|---|
| Rufina Matagolai | – | 80% |
| Jasper Matagolai | – | 10% |
| Ruth Matagolai | – | 5% |
| Tana Matagolai | – | 5% |

Cynthia was deleted as a beneficiary.

Jesus Matagolai died of cancer at Tripler Hospital on June 27, 1985.

## CLAIMS AND DEFENSES OF THE PARTIES

The plaintiff makes a claim on the Lincoln and Pacific policies. She asserts that the change of beneficiaries on the Lincoln policy were without the knowledge or consent of Jesus but if they were, she is entitled to one-half of the proceeds because the premiums were paid from community funds.

As to the Pacific policy, plaintiff argues that Caridad had no authority to execute the change of beneficiaries and any purported change is without any force and effect.

1125

Lastly, plaintiff asserts that any attempted resignation and withdrawal from the retirement fund was unauthorized by Jesus and without his knowledge.

The defendant defends the action by asserting that Jesus gave her specific oral instructions to do what she did and she performed these duties with the general power of attorney.

The minors, Ruth and Tana Matagolai, cross claim against Caridad for her actions related to the retirement fund. They also allege that Caridad had no authority from Jesus to perform the act of resignation and withdrawal and any such action was without his knowledge and consent.

## DISCUSSION

### A.  THE LINCOLN INSURANCE POLICY

There is no evidence to support a finding that Jesus signed the change of beneficiary form under any duress, coercion, fraud or any other circumstance which would be grounds to declare the act void. The document was signed by Jesus on March 21, 1985 while Caridad was still in Honolulu with Jesus.  However, there is nothing in the record to indicate any improper activity on her behalf. The evidence indicates that in March of 1985 Jesus was mentally capable of making a reasoned decision and it is found that he did just that when he changed the beneficiaries on the Lincoln policy.

1126

It is uncontradicted that the Lincoln policy was taken out after the marriage of Jesus to Cynthia. Jesus signed an "Employer Billing Plan of Premium Payment" (Plaintiff's Exhibit 8) which allowed for the payment of the premiums out of his salary.

The Commonwealth is not a statutory community property jurisdiction. However, over the years and in the absence of legislation, the courts have adopted, to some extent, community property principles in the division of marital property. In Re Estate of Camacho, CTC Civil Action 82-72 (1983); Nekai v Nekai, 4 TTR 338 (High Court Trial Div. 1969).

The probate code (Title 8, Division 2) provides for certain rights of an omitted spouse in a will (8 CMC §2701) and makes certain provisions for a surviving spouse in intestate circumstances whether the surviving spouse be Chamorro, Carolinian, or persons of non-Northern Mariana Islands descent (8 CMC §§2902, 2903, 2906, 2912). That there is legislative intent to protect a surviving spouse is clear.

Life insurance policies are contracts which are designed to protect one's survivors and provide funds on the death of the insured. In community property states, policies of life insurance which insured the life of the husband and which are paid for out of community property funds, are characterized as community property. Occidental Life Insurance Co. v

1127

*Powers*, 74 P.2d 27 (Wash.); *Grimm v Grimm*, 157 P.2d 841 (Cal.); *King v Prudential Ins. Co.*, 125 P.2d 282; *Re Towey's Estate*, 155 P.2d 273 (Wash.).

It is found that the Lincoln policy is community property and consistent with *In Re Estate of Camacho*, supra, each spouse, Jesus and Cynthia, owned one-half and on the death of Jesus, Cynthia retains her one-half. Since the policy was taken out after marriage and all premiums were paid from community funds, there is no basis for apportionment. *Modern Woodmen of America v Gray*, 299 P.754 (Cal.); *Patillo v Norris*, 135 Cal.Rptr. 210 (Cal.); *Biltoft v Wootten*, 157 Cal.Rptr. 581 (Cal. 1979).[3]

It is noted that on the change of beneficiary form for the Lincoln policy (Plaintiff's Exhibit 7) a specific community property release is provided. Cynthia did not sign the release. Any attempted change or rescission of her 50% interest in the policy was ineffective.

---

[3]The defendant's opposition to the application of the above community property principles is focused on *Succession of Jackson*, 402 So.2d 753 (1981, La.), referred to in the 1986 supplement to §98, 15A AmJur2d, *Community Property*. This case apparently holds that the second wife of the deceased who is named as a beneficiary on a life policy purchased during the deceased's first marriage, takes the entire proceeds. The full text of the case is not available. In any event, the factual premise of the case appears to be quite different from the case, *sub judice*. Cynthia was the spouse during the purchase of the Lincoln policy and is the surviving spouse of Jesus.

The result reached with regard to the Lincoln policy is consistent with the basic purpose of protecting a surviving spouse's interest in the assets accumulated during marriage.

There should be no distinction between the types of assets involved in In Re Estate of Camacho and an insurance policy. In some, if not many cases, proceeds from a life insurance policy may be the only asset of any significance from a marriage. Should one spouse be able to divest the surviving spouse of all the proceeds, the basic policy and intent of providing for the surviving spouse as indicated by prior case law and the legislature in enacting the probate code would be defeated.

Therefore, the proceeds of the Lincoln policy will be divided as follows:

| | | | |
|---|---|---|---|
| 50% | Cynthia Matagolia | – | surviving spouse |
| 10% | Jasper Matagolai | – | son |
| 10% | Ruth Matagolai | – | daughter |
| 10% | Tana Matagolai | – | daughter |
| 20% | Rufina Matagolai | – | mother |

B.  THE PACIFIC GUARDIAN INSURANCE POLICY.

The change of beneficiaries for this policy is complicated by the fact that the purported change was accomplished by a general power of attorney. There is no specific instruction in the power of attorney (Plaintiff's Exhibit 5) for Caridad to change the beneficiaries on the Pacific policy. However, Caridad

has testified that Jesus specifically instructed her by telephone to change the beneficiaries in the manner specified. This purportedly occurred during the third week in May.

Cynthia has testified that for the period of the hospitalization of Jesus, she was his constant companion and lived at the hospital. Though she recalls some telephone conversations by Jesus with his sister, she states that she was always present and nothing was said by Jesus about changing beneficiaries on any insurance policies. She does admit that she and Jesus gave permission to Caridad to arrange for advance annual and sick leave so that pay checks would keep coming to them in Honolulu.

The court has had the opportunity to observe the demeanor and manner of the witnesses testifying. Certain preliminary factual determinations can be made. First, Cynthia was never an accepted member of the Matagolai family and an animosity for some time existed between Cynthia and members of the Matagolai family, including Caridad, before Jesus became ill. This animosity has continued (and indeed exacerbated with this litigation) to this date. Second, there is every indication notwithstanding the change of beneficiaries on the Lincoln insurance policy, that the marital relationship of Cynthia and Jesus remained good until his death. Third, during the months of April, May and

1130

until the death of Jesus in June, Cynthia was the constant companion of Jesus and it would have been difficult if not impossible for Cynthia not to know of a phone conversation by Jesus. There was no telephone in his room and either Jesus had to be taken by a wheelchair to the phone or a phone brought into the room and the line inserted in the phone jack. During May, and in particular around the third week of the month, Jesus was undergoing extensive chemotherapy treatments and his condition was worsening.

Based upon all the circumstances surrounding the execution of the power of attorney, the change of beneficiaries on the Pacific insurance policy and the testimony of the witnesses, it is found that Jesus did not give Caridad the authority to change any beneficiaries on the Pacific Guardian policy. The power of attorney, although general in nature, does not give specific authority to do what Caridad did. In order to take such a significant step insofar as the insurance policy is concerned, it is the conclusion of the court that without further specific instructions, Caridad had no authority to change the beneficiaries on the Pacific policy. The general terms and words of the power of attorney are to be restricted by the context and the authority given is to be construed strictly so as to exclude the exercise of any power that is not warranted either by the terms actually used or as a

necessary means of executing with effect the authority given. 3 AmJur2d, *Agency*, §32. At the time of the execution of the power of attorney by Jesus, there had been no discussion or conversation between Jesus and Caridad about changing beneficiaries on the Pacific policy. The only purpose of the power of attorney at the time of its execution by Jesus was to apply for advance annual and sick leave.

The defendant relies, of course, on the purported oral instruction of Jesus on or about May 21st. The Commonwealth has no "Dead Man's Statute" but the admissibility of an out of court statement by a deceased is governed by the Rules of Evidence, 802 and 804. No objection was made against the admission of the alleged statements of the deceased even though none of the exceptions in Rule 804(b) appear applicable. Nonetheless, the court views with caution the proferred statements of the deceased because of the obvious impossibility of determining the correctness or fabrication of the statement. Such is clearly the case here. There were no third persons who overheard the alleged telephone conversation.

The statement which the defendant offers would not only be difficult or impossible for the deceased to make without Cynthia knowing about it, but the timing and content of the purported statement is inconsistent with the facts and circumstances found existing before,

1132

at, and following the alleged statement by the deceased. The court simply finds that the deceased, Jesus Matagolai, did not orally instruct Caridad Pangelinan to change the beneficiaries on the Pacific Guardian insurance policy. Therefore any purported change by Caridad was of no force and effect and the policy proceeds shall be disbursed pursuant to the original designation, to wit:

Cynthia Matagolai   -   50%
Jasper Matagolai   -   50%

C.   RETIREMENT FUND BENEFITS.

As a result of the actions of Caridad, there was a substantial loss of benefits to the surviving spouse and the children of Jesus.

Caridad received $2,914.74 which was the contribution of Jesus into the fund. Succinctly put, there was just no benefit or advantage to be gained by the withdrawal of Jesus particularly in light of the fact that by May, when the action was taken to have his contribution withdrawn, Jesus was obviously terminally ill.

Caridad insists that Jesus instructed her to execute the resignation and withdrawal forms in order to gain funds for his funeral and other expenses.

As in the case of the Pacific policy, this uncorroborated statement of a deceased must be viewed

1133

with caution. This is especially true in the case of the Retirement Fund since it was against the pecuniary interest of the survivors of the deceased. At least two different witnesses (Mr. Florian and Mr. Guerrero) specifically told Caridad the adverse effects of withdrawing from the retirement fund. Though Caridad denies this, the court finds that she was told about the results of a withdrawal of the fund.

The court finds that the deceased did not instruct Caridad to execute the resignation from the government nor the application for a refund of the retirement contribution. There is no evidence of any ratification of the acts by Jesus. The money obtained from the Retirement Fund was placed in Caridad's account and Jesus did not know of the existence of said money.

The question remains as to what, if any, effect the apparent authority Caridad possessed with the general power of attorney had upon the action of the Government and the Retirement Fund.

There have been no other resignations from government service performed by the use of a power of attorney. Nor has there ever been a withdrawal of a contribution from the retirement fund by a power of attorney. As noted above, the general power of attorney makes no specific reference to either resignation or withdrawal.

1134

Certainly the government knew where Jesus was because it had arranged for his hospitalization. Yet, there was no effort on its part to confirm his desire to resign from the government.

When a proposed act of an agent is so obviously detrimental to the principal's interest, it is unreasonable for a third party to rely upon anything but express and specific authority to do the act. Restatement, Agency 2d, §§27, 39. There is a duty of the third person to inquire and ascertain the character and extent of the agency, since even a general agent has no implied authority to bind his principal by acts unusual to agencies of like character, or beyond the usual scope of such agencies; and when the agent attempts to bind his principal by extraordinary acts, the one dealing with the agent is put on notice and required to ascertain from some authoritative source whether the agent had the power to bind the principal thereby. Southwestern Bell Tel. Co. v Coughlin, (CA5) 45 F.2d 349, cert. den 282 U.S. 848; Seattle Shoe Co. v Packard, 86 P. 845 (Wash.); Restatement, Agency 2d, §§8 (comment c) 27, 37, 39.

It is concluded that since Caridad had no authority to execute the resignation and withdrawal forms – she is liable for the return of the $2,914.74.

Should the Government and the Retirement Fund agree to accept the refund back and reinstate the retirement

benefits, nothing further need be done.[4] Since neither the Government or Retirement Fund were made parties to this action the court cannot bind them. However, it is hoped that in view of the findings and conclusions made herein that reinstatement of the retirement benefits can be accomplished without further proceedings.

This Memorandum Opinion shall constitute the findings of fact and conclusions of law of the court.

Dated at Saipan, CM, this _22_ day of April, 1987.

Robert A. Hefner, Chief Judge

_____

[4]Should Caridad not comply or have the funds, Cynthia may offer the reinstatement funds to activate the retirement benefits.